IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MARIBEL DE JESÚS CORREA, *et al.*,<br><br>**Plaintiffs,**<br><br>v.<br><br>HOSPITAL ESPISCOPAL SAN LUCAS, *et al.*,<br><br>**Defendants.** | **Civil No.** 21-1112 (FAB) |

**OPINION AND ORDER**

BESOSA, District Judge.

Defendant Hospital Episcopal San Lucas, Inc. ("HESL") moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").  (Docket No. 9)  For the reasons set forth below, HESL's motion to dismiss is **DENIED.**

**I.   Background**

Plaintiffs Maribel de Jesús-Correa ("Maribel") and Félix Luis Rodríguez ("Rodríguez") (collectively, "plaintiffs") are married and reside in the Municipality of Santa Isabel, Puerto Rico. (Docket No. 1 at p. 2)  Their thirty-four-year-old daughter died at HESL on March 18, 2019.  Id.  This litigation stems from a purported violation of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. section 1395dd ("EMTALA").  (Docket No. 1) The following facts from the complaint are construed "in the light

Civil No. 21-1112 (FAB)                                                    2

most favorable to the plaintiff[s]." <u>Ocasio-Hernández v. Fortuño-Burset</u>, 640 F.3d 1, 17 (1st Cir. 2011).

María Iselis Rodríguez-de Jesús ("María") suffered from hypothyroidism, morbid obesity, anemia, depression, anxiety, diabetes, and chronic gastritis. (Docket No. 1 at p. 3) Maribel and María visited the HESL emergency room on three consecutive days in March 2019. <u>Id.</u>

**A.   The March 11, 2019 Emergency Room Visit**

María arrived at HESL on March 11, 2019, "with a headache of constant pain for over 15 hours" and "nausea without vomiting." <u>Id.</u> at p. 4. Doctors Stephen Echsner and Isaac Ruiz-Mercado conducted a "neurological examination." <u>Id.</u> They concluded that María had a "headache." <u>Id.</u> HESL discharged María in "stable condition," requesting that she return to the emergency room "if her symptoms were to recur or worsen." <u>Id.</u>

**B.   The March 12, 2019 Emergency Room Visit**

María continued to experience a "very strong headache." <u>Id.</u> She obtained a referral from her primary care physician "in an effort to expediate" treatment at the HESL emergency room. <u>Id.</u> María returned to HESL on March 12, 2019, but hospital personnel rejected the referral. <u>Id.</u> The triage nurses noted that María "showed great weakness on the left side of her body." <u>Id.</u>

María completed a "physical neurologic exam." Id. at p. 5. The results were "normal." Id. Doctors Figueroa-Jiménez ("Figueroa") and Vivian Pérez-Gómez ("Pérez") wrote the following request to Dr. Aurelio García in María's emergency room record: "Purpose of Consultation – Please evaluate 34 y/o female with headache and Acute Neurologic Deficit." Id.[1] An hour later, Figueroa and Pérez noted that "[u]pon re-evaluation, [María] was found neurological [sic] intact. Will close follow up labs. CT Scan did not show abnormalities." Id.

Doctor Figueroa-Jiménez informed María "that he was going to order [a magnetic resonance imaging exam ("MRI")] and a consult with a neurologist." Id. at p. 6. Doctor García-Medina ("García") then examined her file, however, "recommend[ing] that María Iselis be discharged home." Id. He attributed María's headache to "her use of Klonopin," a medication prescribed for a preexisting condition. Id. Maribel and María notified Doctor García that the MRI and consultation "had not [yet] been performed." Id. Doctor García insisted that María forego the MRI, stating that:

> the limitation in coverage of María Iselis' health insurance and the insurer's usual reluctance to cover the cost of the MRI, couple[d] with the neurologists' unwillingness to respond to consults at the hospital, particularly if the applicable health insurance is the one covering María Iselis, made it unlikely that [she]

---

[1] Only certain doctors are referred to by their full names. (Docket No. 1)

Civil No. 21-1112 (FAB)                                                                 4

> would be examined by a neurologist or would receive the MRI imaging test at San Lucas. Hence, . . . María Iselis should try to obtain such services on her own outside San Lucas.

Id. He provided María with a "handwritten note with the names of three neurologists that they could visit outside of [HESL]." Id.

HESL discharged María with "instructions to visit a neurologist" and a prescription for Propranolol to control high blood pressure. Id. at p. 7. The "departure information" in María's medical record states the following: "Primary Impression: Acute Neurologic Deficit. Disposition: 01 Discharge Home, Self-Care. Condition: Stable." Id. Doctor García wrote, however, that he assessed "Female 34 with migraines headaches recurrent w/o meds for prophylaxis on Klonopin. No neuro deficit upon physician exam." Id.

### C. The March 13, 2019 Emergency Room Visit

The next day, Maribel "took María to the office of Dr. J. Scarano ["Scarano"]," a neurologist. Id. He prescribed "a couple of MRI tests." Id. The tests revealed, *inter alia*, "an apparent near total or total obstruction of the (L) internal carotid artery at the cervical origin." Id. at pp. 7—8. Before María left the MRI imaging office, Scarano called Maribel with the results. Id. at p. 8. He ordered María to seek medical treatment at the HESL emergency room without delay. Id. Maribel "reacted with great concern, given [their] previous negative experience" the day

Civil No. 21-1112 (FAB)                                                   5

before.  Id.  Scarano assured them, however, that he called HESL, and that María would be treated immediately upon her arrival.  Id.

Maribel and María arrived at HESL on March 13, 2019, at 2:28 p.m.  Id.  Nearly two hours later, HESL admitted María "under the services of Dr. Aurelio García" for "Severe Right Carotid Artery Occlusion" and "Stroke Right Side."  Id.  HESL personnel discovered María on the hospital floor, alone and unresponsive.  Id.  She was pronounced dead at 3:47 p.m. on March 18, 2019.  Id. at p. 11.

Maribel and Rodríguez commenced this action on March 9, 2021, setting forth an EMTALA cause of action and three medical malpractice claims pursuant to Puerto Rico law.  (Docket No. 1)  HESL moves to dismiss the complaint.  (Docket No. 9)  The plaintiffs responded.  (Docket No. 14)

**II.  Federal Rule of Civil Procedure 12(b)(6)**

Pursuant to Rule 12(b)(6), defendants may move to dismiss an action for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The dispositive inquiry is whether the plaintiffs have alleged sufficient facts to "raise a right to relief above the speculative level."  Id. at 555.  Any ambiguities in the complaint

are resolved in the plaintiff's favor. Ocasio-Hernández, 640 F.3d at 17.

The Rule 12(b)(6) analysis is limited to the four corners of the complaint. First, the Court disregards "statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). Second, the Court "take[s] the complaint's well-pled (*i.e.*, non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see[s] if they plausibly narrate a claim for relief." Id.

**III. The Emergency Medical Treatment and Active Labor Act**

In the early twentieth century, private hospitals possessed unfettered discretion to admit or reject prospective patients. Beverly Cohen, Disentangling EMTALA from Medical Malpractice: Revisiting EMTALA's Screening Standard to Differentiate Between Ordinary Negligence and Discriminatory Denials of Care, 82 Tul. L Rev. 645, 648 (2007). Hospitals engaged in patient "dumping," the practice of "turning away or transferring indigent patients without evaluation or treatment." Smith v. Crisp Reg'l Hosp., 985 F.3d 1306, 1307-08 (11th Cir. 2021) (citation and quotation omitted).

Congress enacted EMTALA in 1986 as a prophylactic measure, preventing hospitals from "refusing to treat patients with emergency conditions but no medical insurance." Ramos-Cruz v. Centro Médico Del Turano, 642 F.3d 17, 18 (1st Cir. 2000) (citation omitted). The statute provides a civil cause of "action against a participating hospital," allowing for individuals harmed by prohibited conduct to "obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate." 42 U.S.C. § 1395dd(d)(2)(A).[2]

EMTALA is not, however, a federal medical malpractice statute. Correa, 69 F.3d at 1192; Reynolds v. MaineGeneral Health, 218 F.3d 78, 83 (1st Cir. 2000) ("EMTALA is a limited 'anti-dumping' statute, not a federal malpractice statute.") (quotation and citation omitted); Kenyon v. Hosp. San Antonio, Inc., 951 F. Supp. 2d 255, 262 (D.P.R. 2013) ("Allegations that a hospital breached its duty of care in screening and diagnosing a patient state a claim for medical malpractice pursuant to state tort law, not an EMTALA violation") (Besosa, J.). The plaintiff must establish that:

> (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent facility);

---

[2] A "participating hospital" is defined as "a hospital that has entered into a [Medicare] provider agreement." 42 U.S.C. § 1395dd(e)(2).

> (2) the patient arrived at the facility seeking treatment; and
>
> (3) the hospital either (1) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition.

Álvarez-Torres v. Ryder Mem'l Hosp., Inc., 582 F.3d 47, 51 (1st Cir. 2009) (citation omitted). HESL concedes that the first two elements are satisfied. (Docket No. 9 at p. 9)

Rodríguez and Maribel assert that HESL (1) failed to provide María with an appropriate screening, and (2) discharged her without the proper stabilization. (Docket No. 1)[3] HESL argues, however, that the allegations in the complaint do not substantiate the plaintiff's screening and stabilization claims. The Court disagrees with HESL.

## IV.  The EMTALA Screening Requirement

EMTALA requires that participating hospitals "provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition [exists]." 42 U.S.C.

---

[3] The complaint sets forth a single cause of action pursuant to EMTALA. The screening and stabilization claims are, however, distinct causes of action. See López-Soto v. Hawayek, M.D., 175 F.3d 170 (1st Cir. 1999) (holding that "subsections (a) [the duty to screen] and (b) [the duty to stabilize] of EMTALA operate disjunctively").

§ 1395dd(a). Because the statute does not define "appropriate medical screening," cases establishing the parameters of EMTALA liability are legion. See Cleland v. Bronson Health Care Grp., 917 F.2d 266, 271 (6th Cir. 1990) (noting that "'Appropriate' is one of the most wonderful weasel words in the dictionary, and a great aid to the resolution of disputed issues in the drafting of legislation").

The First Circuit Court of Appeals has held that "appropriate medical screening" is an examination "reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." Correa v. Hosp. S.F., 69 F.3d 1184, 1192 (1st Cir. 1995). Thus, the "appropriate medical screening" mandate is substantive (*i.e.* the screening is reasonable) and procedural (*i.e.* the screening is uniformly administered). Carmen Guadalupe v. Negrón-Agosto, 299 F.3d 15, 20 (1st Cir. 2002). Rodríguez and Maribel shoulder the burden of demonstrating that HESL failed to comply with EMTALA's substantive and procedural screening requirements. Torres-Otero v. Hosp. Gen. Menonita, Inc., 115 F. Supp. 2d 253, 258 (D.P.R. 2000) (Pieras, J.).

### A. The Substantive Screening Requirement

According to Rodríguez and Maribel, the screening performed at HESL was "not reasonably calculated to identify the critical conditions that may have been affecting María . . . given the specific symptoms and medical history of her condition." (Docket No. 1 at p. 12)  HESL maintains that the complaint sets forth a "classic medical malpractice" claim, not an EMTALA cause of action.  (Docket No. 9 at p. 6)  Doctor García's cancelation of the MRI and consultation, however, supports the proposition that the screening conducted at HESL was not "reasonably calculated to identify . . . critical medical conditions."  Correa, 69 F.3d at 1192.  An appropriate medical screening may have included an MRI and consultation with a neurologist.

### B. The Procedural Screening Requirement

HESL allegedly "failed to [screen María] in the same way that it would have [screened] other patients in similar conditions."  (Docket No. 1 at p. 12)  Pursuant to EMTALA, screening must occur in an "even-handed[]" manner. Id. (affirming a $700,000 jury verdict because "the decedent was denied the screening . . . that [the hospital] customarily afforded to persons complaining of chest pains"); Negrón Agosto, 299 F.3d at 20 (holding that "a hospital satisfies EMTALA's 'appropriate medical screening' requirement if it provides a patient with an examination

Civil No. 21-1112 (FAB)                                          11

comparable to the one offered to other patients presenting similar symptoms") (citation and quotation omitted).  Essentially, Rodríguez and Maribel "must show that [María] was given a screening that was different from that afforded as a matter of course to patients presenting the same symptoms."  Feighery v. York. Hosp., 59 F. Supp. 2d 96, 102-03 (D. Me. 1999) (citation omitted).

A hospital's existing protocols "set the parameters for an appropriate screening."  Cruz-Queipo v. Hosp. Español Auxilio Mutuo de Puerto Rico, 417 F.3d 67, 70 (1st Cir. 2005) (quoting Correa, 69 F.3d at 1193); Battle v. Memorial Hosp., 228 F.3d 544, 558 (5th Cir. 2000) ("Evidence that a hospital did not follow its own screening procedures can support a finding of EMTALA liability for disparate treatment.").  The complaint assumes that HESL possessed and departed from an applicable screening protocol. (Docket No. 1 at p. 12)  This is a factual issue, ripe for discovery but not necessary to raise a viable EMTALA cause of action.  See Negrón-Agosto, 299 F.3d at 22 ("Although they are effective for demonstrating disparate treatment, written hospital screening policies may not exist, and therefore cannot be necessary to a disparate treatment determination.").

HESL contends that it complied with EMTALA because "on each and every emergency room visit [María] was seen and received medical attention."  (Docket No. 9 at p. 10)  That María was "seen"

Civil No. 21-1112 (FAB)                                           12

and "received medical attention" does not establish whether HESL screened her differently than similarly situated patients. Doctor García purportedly cancelled María's MRI and consultation with a neurologist because her insurance would refuse to pay for these services. (Docket No. 1 at p. 6) This allegation suggests that HESL failed to provide María with an appropriate medical screening.

Accordingly, because the complaint contains facts concerning EMTALA's screening requirement that raise the prospect of relief above the speculative level, the screening cause of action survives HESL's motion to dismiss.

**V.   The Stabilization Requirement**

When a hospital determines that a patient has an emergency medical condition, it must either stabilize the patient "within the staff and facilities available at the hospital," or transfer the patient "to another medical facility." 42 U.S.C. § 1395dd(b)(1).[4] EMTALA defines the phrase "to stabilize" as "to provide such medical treatment of the condition as may be necessary

---

[4] An emergency medical condition is:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in – (i) placing the health of the individual [] in serious jeopardy, or (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part.

42 U.S.C. § 1395dd(e)(1)(A).

Civil No. 21-1112 (FAB)                                         13

to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." Id. § 1395dd(e)(3)(A).

The duty to stabilize "does not hinge on the result of the plaintiff's condition after the release, but rather on whether the hospital would have considered another patient in the same condition as too unstable to warrant his or her release or transfer." Milán v. Hosp. San Pablo, 389 F. Supp. 2d 224, 232 (D.P.R. 2005) (Pieras, J.). Hospitals have no obligation to "fully cure an emergency condition before transferring or discharging a patient." Nieves v. Hosp. Metropolitano, 998 F. Supp. 127, 133 (D.P.R. 1998) (Casellas, J.). Stabilization is necessary only if the hospital is aware of the patient's emergency medical condition, and the patient is discharged or transferred. López-Hawayek, 175 F.3d at 172; Correa, 69 F.3d at 1190. To determine whether a patient has been stabilized, the trier of fact "must consider whether the medical treatment and subsequent release were reasonable, in the view of the circumstances that existed at the time the hospital discharged or transferred the individual." Marrero v. Hosp. Hermanos-Meléndez, 253 F. Supp. 2d 179, 197 (D.P.R. 2003) (Domínguez, J.) (citation omitted).

Doctor García discharged María with instructions to obtain an MRI from a third-party facility. (Docket No. 1 at p. 6) Perhaps the MRI and consultation with an neurologist were reasonable measures, necessary to prevent deterioration of María's health. The complaint contains facts concerning EMTALA's stabilization requirements that raise the prospect of relief above the speculative level, the stabilization cause of action survives HESL's motion to dismiss.

Accepting the EMTALA allegations as true, see Schatz, 669 F.3d at 55, and mindful that the complaint need not include a "high degree of factual specificity," the Court holds that the EMTALA claims "*in toto* . . . render plaintiffs' entitlement to relief [pursuant to EMTALA] plausible." see Rodríguez-Reyes, 711 F.3d at 55-56.

**VI. The Puerto Rico Medical Malpractice Claims**

A federal court exercising original jurisdiction may assert supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). District courts possess considerable discretion in determining whether to exercise this authority, considering factors such as judicial economy, convenience, fairness to litigants, and comity. Ramos-Echevarría v. Pichis, Inc., 659 F.3d

182, 191 (1st Cir. 2011).  Rodríguez and Maribel's medical malpractice claims are "so related" to their EMTALA claim. Accordingly, the Court will retain supplemental jurisdiction over the Puerto Rico law causes of action.

**VII. Conclusion**

For the reasons set forth above, the HESL's motion to dismiss is **DENIED**.  (Docket No. 9)

**IT IS SO ORDERED.**

San Juan, Puerto Rico, November 12, 2021.

                                             s/ Francisco A. Besosa
                                             FRANCISCO A. BESOSA
                                             UNITED STATES DISTRICT JUDGE